1

2

3

4

5

6

7

8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10

11   JOHN M. KNOX,                    )   NO. SACV 05-00542-SS
                                      )
12                  Plaintiff,        )
                                      )   **MEMORANDUM DECISION AND ORDER**
13            v.                      )
                                      )
14   JO ANNE B. BARNHART,             )
     Commissioner of the Social       )
15   Security Administration,         )
                                      )
16                  Defendant.        )
     _____)

17

18          John M. Knox ("Plaintiff") seeks review of the decision of the

19   Commissioner of the Social Security Administration (hereinafter the

20   "Commissioner" or the "Agency") denying his application for Social

21   Security Income ("SSI") and Disability Insurance Benefits ("DIB").  On

22   August 12, 2005, the parties consented, pursuant to 28 U.S.C. § 636(c),

23   to the jurisdiction of the undersigned United States Magistrate Judge.

24   Plaintiff is represented by Bill LaTour, Esq.  Defendant is represented

25   by Assistant United States Attorney Cedina M. Kim.  This matter is

26   before the Court on the parties' Joint Stipulation filed on April 14,

27   2006.  For the reasons stated below, the decision of the Commissioner

28   is AFFIRMED.

## PROCEDURAL HISTORY

On April 16, 2003, Plaintiff filed an application for SSI and DIB under Sections 216(I) and 223 of the Social Security Act. (Administrative Record ("AR") 11, 39-41).   Plaintiff claimed an inability to work since December 31, 1998 due to bipolar disorder, lethargy, severe memory loss, confusion, depression, anxiety, and anger issues.  (AR 46).

After the Agency denied Plaintiff's claim at the initial and reconsideration levels, Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ").  (AR 19-24, 27-32).  A hearing was held before ALJ Helen E. Hesse on August 16, 2004.   (AR 150-77). Plaintiff was represented by counsel and testified in his own behalf. A medical expert and a vocational expert also testified.  On September 15, 2004, the ALJ issued a decision denying Plaintiff benefits.  (AR 11-16).   Plaintiff then sought review of the ALJ's decision before the Appeals Council.   On May 19, 2005, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner.  (AR 4-6).  Plaintiff then commenced this action.

## FACTUAL BACKGROUND

Plaintiff was born on April 22, 1946 and was fifty-eight years old at the time of the hearing.  (AR 39, 153).  He has a college education and past relevant work as a proofreader and vice-president of marketing. (AR 47, 87, 153).   He has not worked since 2000, when he was a

2

proofreader for three or four months.  He left that job because it was "too stressful."  (AR 154).  Prior to this job, Plaintiff was vice president of marketing at his family's hardware store from 1973 to 1998.  (AR 75, 87).  Plaintiff managed the sales personnel and the advertising department, conducted meetings, wrote reports, made sales calls, planned company activities, and delivered products.  (AR 75-76, 87).

### A.  __Plaintiff's Treatment Records__

Dr. Edward Kaufman is a psychiatrist who has treated Plaintiff for his mental health conditions.  (AR 155).  Plaintiff sees Dr. Kaufman once a month for about twenty minutes each.  (AR 155).  Dr. Kaufman has been Plaintiff's treating physician from 2001 to the present.  (AR 109-120, 146, 155).

In February 2001, Dr. Kaufman diagnosed Plaintiff with bipolar disorder.  At a mental status examination on February 12, 2001, Plaintiff's mood was euthymic, his sensorium and memory were intact, and he did not exhibit any hallucinations or delusions.  Dr. Kaufman indicated that Plaintiff's medications for his bipolar disorder and depression worked "well."  (AR 118-19).  By April 2001, Dr. Kaufman noted that Plaintiff was "doing well," was getting back together with his ex-wife, and was sleeping well.  (AR 119).  On March 28, 2002, Dr. Kaufman reported that Plaintiff married his seventh grade sweetheart, felt "great," and felt that his medications were "a dream."  (AR 112).  On March 17, 2003, Dr. Kaufman stated that Plaintiff's new marriage was "good" and that Plaintiff was doing well.  (AR 112).

\\

3

On June 16, 2003, Dr. Kaufman observed that Plaintiff's medication kept Plaintiff's anger under "fair to good control," that his judgment was poor when manic, but that his insight was good.  (AR 109).  Dr. Kaufman also noted that Plaintiff's short term memory and concentration were decreased and Plaintiff experienced psychotic symptoms only when he was manic.  Dr. Kaufman concluded that Plaintiff was "very limited" in his ability to handle stress, conceptualize tasks, and get along with co-workers, but that Plaintiff was capable of handling his own funds.  (AR 109).  In August 2003, Dr. Kaufman wrote that Plaintiff "doesn't socialize, functioning marginally."  (AR 146).  However, in October 2003, Dr. Kaufman stated that the medications were working for Plaintiff.  (AR 146).

On November 7, 2003, Dr. Kaufman completed two-page, check-box form entitled "Work Capacity Evaluation (Mental)."  (AR 148-149).  In the report, Dr. Kaufman stated that Plaintiff had "extreme" limitations in his ability to accept instructions and respond appropriately to criticism from supervisors, and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (AR 149).  Dr. Kaufman also found that Plaintiff had "marked" limitations in his ability to maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (AR 148-149).  Furthermore, Dr. Kaufman thought Plaintiff had "moderate" limitations in his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple

4

work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (AR 148-49).

On July 11, 2002, general practitioner Dr. John Chard diagnosed a spot on Plaintiff's right temple as cancerous and removed it.  (AR 94). On June 30, 2004, Dr. Chard detected another cancerous spot on Plaintiff's left cheek and removed it.  (AR 141-42).  Plaintiff did not go through chemotherapy.  (AR 155).

**B.   <u>Non-Examining State Agency Psychiatrist's Evaluation</u>**

On June 25, 2003, a State Agency psychiatrist, Dr. Kenneth Michael, reviewed the medical records and completed a Residual Functional Capacity Assessment and a Psychiatric Review Technique form.  (AR 121-33).  In the Psychiatric Review Technique form, Dr. Michael marked off boxes indicating that Plaintiff had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (AR 129).  In the narrative, summary, Dr. Michael concluded that Plaintiff should be limited to non-public, simple repetitive tasks.  (AR 132).  Dr. Michael noted that he reviewed Dr. Kaufman's records and he gave "compelling weight" to them. (AR 132).  However, Dr. Michael found that the alleged severity of Plaintiff's symptoms was disproportionate to the expected severity of such symptoms on the basis of Plaintiff's medically determinable impairments.  (AR 132).

In the Residual Functional Capacity Assessment Form, Dr. Michael checked off boxes indicating that Plaintiff was "moderately" limited in his ability to remember locations and work-like procedures; maintain attention and concentration for extended periods; perform activities within a schedule; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions and perform at a consistent pace; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation. (AR 121-22).  Dr. Michael thought that Plaintiff was "markedly" limited in his ability to understand and remember detailed instructions; carry out detailed instructions; and interact appropriately with the general public.  (AR 121-22).

## C.   Consultative Examination

On January 16, 2004, psychologist Dr. Jonathan Rich examined Plaintiff for a consultative psychological evaluation at the request of the Agency.  (AR 134-140).  Plaintiff reported that he suffered from depression, anxiety, and irritability without medications, but that he suffered from concentration and memory problems with medication.  (AR 134).  Plaintiff stated that he first visited a psychiatrist when he was twenty-two years old at his father's urging.  He reported a "complete breakdown" at age thirty-three or thirty-four and received extended psychiatric treatment at that time.  For the past four years, Plaintiff had been receiving only outpatient psychiatric treatment.  He had never

been psychiatrically hospitalized and had never attempted suicide.  (AR 135).  Plaintiff told Dr. Rich that he was able to shower, bather, groom, and dress himself.  He described his activities in a typical day as going out to walk, playing with his computer, reading, swimming, talking to and visiting with family and friends, and doing light chores around the house.  He reported trying hard to avoid stress.  (AR 135).

At the mental status examination, Dr. Rich noted that Plaintiff demonstrated a broad range of affect, he responded in a coherent and relevant fashion, his memory was intact, his fund of information was superior, his attention and concentration were adequate, and his judgment and insight were intact.  (AR 136-37).  In the IQ tests, Plaintiff received a score of 114 in the verbal IQ test, 102 in the full scale IQ test, and a performance IQ score of 86.  These scores were within the average range.  (AR 137-38).  Plaintiff's immediate memory was weaker than would be expected given his intelligence and he demonstrated mild short-term memory deficits.  (AR 138).

Dr. Rich diagnosed Plaintiff with bipolar disorder, which was under good medical control.  He concluded that Plaintiff would have a slight to moderate impairment in his ability to recall simple or complex instructions.  Dr. Rich thought that Plaintiff could carry out simple, short instructions; was able to make adequate judgment on work related decisions; showed adequate task pace and persistence; had a slight impairment in his ability to interact appropriately with coworkers, supervisors, and the public; and a moderate impairment in his ability to deal appropriately with work pressures and to deal with changes in the work place.  (AR 139-40).

### D.   **Medical Expert's Testimony**

During the hearing, psychologist Dr. Craig Rath testified as a medical expert and asked Plaintiff a series of questions. (AR 157-164). Dr. Rath had reviewed Plaintiff's medical records before the hearing. (AR 157). Dr. Rath discussed the medical evidence in the record and noted Dr. Kaufman's restrictive limitations. Dr. Rath thought that Dr. Kaufman's marked limitations did not "quite match" Dr. Kaufman's notes. (AR 162). Overall, Dr. Rath thought that Dr. Kaufman's limitations seemed to be "very much stress related" and Dr. Rath thought that the main limitation for Plaintiff was to avoid no more than mild to moderate stress. (AR 162).

After questioning Plaintiff, Dr. Rath testified that Plaintiff appeared to have a genuine bipolar disorder that was controlled with medication, but he was "hyper-reactive to stress." (AR 162). Dr. Rath did not think Plaintiff met or equaled any listed impairment. (AR 167-68). Dr. Rath thought that Plaintiff's restriction of activities of daily living would be moderate, his difficulty in maintaining social functioning would be moderate, and his difficulties in maintaining concentration, persistence, or pace would be moderate. (AR 160). Dr. Rath believed that Plaintiff could perform moderately complex tasks if he were in a low stress situation. (AR 163). However, if he were under moderate to high stress, Plaintiff would be limited to simple repetitive tasks. (AR 163). Furthermore, Plaintiff should avoid, "out of an abundance of caution," moving machinery, heights, fast-moving machinery, and safety operations of others. (AR 163). Dr. Rath testified that due to Plaintiff's social anxiety, Plaintiff should also avoid anything with

a high production quota or a lot of stress.  Plaintiff should further be restricted to brief superficial contact with the public, peers, and supervisors.  (AR 163-164).

### E.   **Plaintiff's Testimony**

Plaintiff was fifty-eight years old at the time of the hearing. He had a Bachelor of Arts degree in History and last worked in 2000 as a proofreader.  He left that job because the deadlines became too stressful for him.  (AR 153-54).  Plaintiff lived with his wife, Jacqueline Knox.  (AR 153).

Plaintiff testified that he saw Dr. Kaufman for his mental health treatment.  (AR 155).  Plaintiff saw Dr. Kaufman once a month for about twenty minutes.  (AR 155).  Plaintiff described this treatment as being "primarily medication review and just to make sure that I'm doing all right."  (AR 155).  He did not receive any group therapy.  (AR 155-56).

The medical expert asked Plaintiff about Dr. Kaufman's notes of August 2003, which indicated that Plaintiff was "functioning marginally."  (See AR 146).  Plaintiff replied, "I don't know why he said I was functioning marginally to be honest with you.  Since I was put on this medicine nearly four years ago I have been functioning well."  (AR 159).  Plaintiff currently took Prozac, Zyprexa, and Depakote.  (AR 159).  He testified that the combination worked "very well" for him.  (AR 159).  However, he alleged that the medications' side effects were that he gained weight (about thirty pounds), his

9

memory was "shot," he was lethargic, and his sexual drive was low.  (AR 159, 172).

Plaintiff testified that he could not work because the medication worked only "in conjunction with no stress."  (AR 169).  Plaintiff explained: "I found that if I take the medication and lead a stress free life I'm okay.  If I don't take the medication I've got all kinds of problems.  If I take the medication and have a lot of stress I still get anxious and angry and upset." (AR 169).  Plaintiff declared, "You know, I feel if I can keep my life within certain parameters and not engage in a lot of stressful activities I'll be okay."  (AR 173).

Regarding his daily activities, Plaintiff testified that he got out of the house to see his mother once or twice a week.  (AR 169).  He "[v]ery rarely" went to the grocery store; his wife went instead because he found it very stressful to be in places where there were a lot of people.  (AR 170).  He described his relationship with his wife as "wonderful" and stated that he never got angry with her.  Plaintiff also stated that he walked the dog twice a day and went out to dinner once in a while.  (AR 171).  He also liked to watch TV and movies, and he liked to read, even though he could not remember what he read.  (AR 172).

Plaintiff stated that he had not applied for work since 2000.  (AR 174).  He did not intend to ever try to go back to work because it was too stressful for him.  (AR 174).  He and his wife lived on the profits from selling a family owned business.  (AR 174).  Plaintiff also collected rent on two buildings that he owned with his brother and

cousin.   (AR 174).   He stated that his brother took care of all the rent-collecting, however.   He then explained that money was stressful to him and that one of the reasons he filed for social security benefits were because his medication costs were so high.   He and his wife paid about $1,300 a month from their savings for insurance, medication, and doctor expenses.   (AR 175).

### F.   The Vocational Expert's Testimony

Mr. David Rinehart testified at the hearing as a vocational expert ("VE").   The ALJ's hypothetical to Mr. Rinehart involved an individual of the same age, education and work experience as Plaintiff, and limited to (1) no unprotected heights, (2) no hypervigilence or high production quota or rapid assembly line work, (3) brief, superficial contacts with co-workers, supervisors and the public, and (4) a low stress environment with moderately complex tasks.   (AR 165-166).   Mr. Rinehart testified that such an individual could not perform any of Plaintiff's past work.   (AR 166).   However, Mr. Rinehart stated that the hypothetical person could perform unskilled, entry level work, including: (1) cleaner-hospital; 4,700 regional, 100,000 national, (2) packager-hand; 1,100 regional, 17,000 national, (3) porter-used car lot; 1,800 regional, 27,000 national.   (AR 166).   The testimony would not change if the hypothetical was amended to moderate stress situations with simple, repetitive tasks.   (AR 166).

\\

\\

\\

\\

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. § 404.1520. The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled. If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is

---

[1]  Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. § 404.1510.

12

found disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R. § 404.1520(a)(4).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54 (citing Tackett).  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity,[2] age, education and work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. § 404.1520(g).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart

---

[2] Residual functional capacity is "what [one] can still do despite [her] limitations" and represents an "assessment based upon all of the relevant evidence."  20 C.F.R. §§ 404.1545(a), 416.945(a).

1  P, Appendix 2 (commonly known as "the Grids").  Osenbrock v. Apfel, 240

2  F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett).  When a claimant has

3  both exertional (strength-related) and nonexertional limitations, the

4  Grids are inapplicable, and the ALJ must take the testimony of a

5  vocational expert.  Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000)

6  (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

7

8                          **THE ALJ'S DECISION**

9

10     At the first step of the sequential evaluation process, the ALJ

11  observed that Plaintiff had not engaged in substantial gainful activity

12  since the alleged onset of disability in 1998.  (AR 15).  Next, the ALJ

13  found that Plaintiff's bipolar disorder was a "severe" impairment.  (AR

14  15).  However, it did not meet or medically equal one of the listed

15  impairments in Appendix 1, Subpart P, Regulation No. 4.  (AR 15).

16

17     The ALJ found that Plaintiff had the following RFC: Plaintiff was

18  precluded from unprotected heights, dangerous or fast moving machinery.

19  Plaintiff could do moderately complex tasks, where no hypervigilence was

20  required, and he is not in charge of safety operations.  He could do low

21  stress work with no high production, quota, or rapid assembly line work.

22  (AR 15).

23

24     Based on Plaintiff's RFC and the vocational expert's testimony, the

25  ALJ concluded that Plaintiff could not return to his past relevant work.

26  (AR 14, 16).  However, using the Grids as a framework and the testimony

27  of the vocational expert, the ALJ concluded that there was a significant

28  number of jobs in the national economy that Plaintiff could perform,

                                    14

such as a hospital cleaner, hand packer, and used car lot porter. Accordingly, Plaintiff was not disabled at any time through the date of the decision.  (AR 16).

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279).  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)). \\

15

1

2

**DISCUSSION**

3     Plaintiff contends that the ALJ did not properly consider the

4 treating physician's opinion, develop the record, consider the lay

5 witness testimony, or pose a complete hypothetical to the vocational

6 expert.  This Court disagrees in all respects.

7

8     **A.     The ALJ Properly Considered the Treating Physician's Opinion**

9

10    Plaintiff contends that the ALJ did not properly consider Dr.

11 Kaufman's opinion regarding Plaintiff's limitations as set out in the

12 Work Capacity Evaluation dated November 7, 2003. (Jt. Stip. at 3-4).

13 Dr. Kaufman had found that Plaintiff had "extreme" limitations in his

14 ability to accept instructions and respond appropriately to criticism

15 from supervisors, and to get along with co-workers or peers without

16 distracting them or exhibiting behavioral extremes.  (AR 148-49).  The

17 ALJ rejected Dr. Kaufman's limitations because it was not supported by

18 objective medical findings.  (AR 13).  The ALJ further noted that there

19 was no objective basis provided for these extreme limitations.  (AR 13).

20

21    Although the treating physician's opinion is entitled to great

22 deference, it is "not necessarily conclusive as to either the physical

23 condition or the ultimate issue of disability." Morgan v. Comm'r of

24 Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).  "When there is

25 conflicting medical evidence, the Secretary must determine credibility

26 and resolve the conflict." Matney v. Sullivan, 981 F.2d 1016, 1019 (9th

27 Cir. 1992).  The ALJ may reject a treating physician's opinion in favor

28 of a conflicting opinion of an examining physician if the ALJ makes

findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.  <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989).  In addition, the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.  <u>See</u> <u>Matney</u>, 981 F.2d at 1019.

A review of the records reveal that the ALJ was correct to conclude that Dr. Kaufman's opinion was not supported by the objective medical findings or even by his own treatment notes.  His treatment notes indicated that Plaintiff was doing well on medications.  (AR 118-19; <u>see also</u> AR 109-119, 148-149).  Dr. Kaufman does not indicate why he assessed the extreme limitations to Plaintiff.  His opinion was submitted on a two-page, check-box format that was conclusory and not supported by clinical findings.  Accordingly, the ALJ's reason for rejecting Dr. Kaufman's opinion as unsupported by objective medical findings was specific and legitimate.  Moreover, medical evidence in the record does not reflect the purported extreme and marked limitations alleged in the Work Capacity Evaluation and the opinions of the State Agency physician, the consultative examiner, and the medical expert conflicted with Dr. Kaufman's opinion.

Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. \\

17

1995).  "It is then solely the province of the ALJ to resolve the conflict."  Id.

Dr. Rich, the consultative psychologist, based his opinion on independent clinical findings after a thorough examination.  He found that Plaintiff would be able to carry out simple, short instructions and to make adequate judgment on work related decisions. (AR 13).  Dr. Rich determined that Plaintiff had a "slight" impairment in his ability to interact appropriately with coworkers, supervisors and the public. (AR 13).  This assessment was in direct conflict with Dr. Kaufman's opinion that Plaintiff had "extreme" limitations in his ability to accept instructions, to respond appropriately to criticism from supervisors, and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (AR 149).  Dr. Rich's opinion that Plaintiff showed adequate task and pace, an opinion he formed based on Plaintiff's performance on the Trails tests, was also in direct conflict with Dr. Kaufman's opinion that Plaintiff had "marked" limitations in his ability to maintain attention and concentration for extended periods.  Dr. Rich's conclusions, however, were supported by objective medical evidence in the record whereas Dr. Kaufman's were not.

Dr. Rath's testimony and Plaintiff's own testimony also supported the ALJ's rejection of Dr. Kaufman's opinion.  During the hearing, Dr. Rath testified that Plaintiff was capable of doing simple repetitive tasks with moderate to high stress and moderately complex tasks in a low stress situation.  (AR 163).  Dr. Rath noted Dr. Kaufman's extreme limitations and stated that the limitations did not "quite match" Dr. Kaufman's own treatment notes.  (AR 162).  Dr. Rath asked Plaintiff why

Dr. Kaufman reported that Plaintiff was functioning marginally in August 2003.  (AR 159).  Plaintiff responded, "I don't know why [Dr. Kaufman] said I was functioning marginally to be honest with you.  Since I was put on this medicine nearly four years ago I have been functioning well. I don't have the mood swings anymore as long as I keep the stress down." (AR 159).  Plaintiff testified that the combination of Depakote, Zyprexa and Prozac works "very well" for him.  (AR 159).  He stated, "You know, I feel if I can keep my life within certain parameters and not engage in a lot of stressful activities I'll be okay."  (AR 169).  Therefore, Plaintiff's own assessment of his condition was more consistent with Dr. Rath's report than with Dr. Kaufman's.  (AR 13).

The Ninth Circuit has determined that it is solely the province of the ALJ to resolve conflicts between the opinion of a treating physician and the opinion of a nontreating source based on independent clinical findings.  <u>Andrews</u>, 53 F.3d at 1041.  Dr. Kaufman's own medical findings in the record did not support the purported limitations he noted in the Work Capacity Evaluation.  (AR 118-119, 148-149).  In contrast, the opinions of the consultative physicians were based on objective, clinical findings.  Given all the evidence, the ALJ properly rejected Dr. Kaufman's opinion of Plaintiff's limitations with specific and legitimate reasons.

### B.   <u>The ALJ Properly Developed the Record</u>

Plaintiff contends that the ALJ did not properly develop the record regarding Dr. Kaufman's opinion.  Plaintiff alleges that if the ALJ lacked objective medical findings in order to properly assess Dr.

19

Kaufman's opinion, the ALJ should have re-contacted Dr. Kaufman in order to obtain the objective medical findings she needed in order to properly assess the opinion.  (Jt. Stip. at 7).

The ALJ has an affirmative duty to fully and fairly develop the record in a social security case.  Tonapetyan v. Halter, 242 F. 3d 1144, 1150 (9th Cir. 2001).  However, only ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry or gather additional information.  Id.  See also Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002) (duty not triggered where the ALJ did not make a finding that the medical report was inadequate to make a disability determination).

Plaintiff contends that the ALJ should have contacted Dr. Kaufman to obtain the objective medical findings she needed in order to properly assess his opinion of disability.  However, Plaintiff's allegation is without merit.  The Commissioner will recontact medical sources only when the medical evidence in the record "is inadequate" for the Commissioner to determine whether a claimant is disabled.  20 C.F.R. § 416.912(e).  The Commissioner will either seek additional evidence or clarification from the treating physician when a medical report contains a "conflict" or an "ambiguity" that must be resolved.  20 C.F.R. § 416.912(e)(1).  Here, there were no conflicts or ambiguity that had to be resolved, nor did the ALJ make such a finding.  Instead, the ALJ merely found that Dr. Kaufman's opinion was not supported by the objective medical evidence in the record.  Therefore, the ALJ's duty to develop the record was not triggered.

Furthermore, the ALJ had medical opinions from numerous other physicians.  The report from the consultative examiner, Dr. Rich, was amply supported with objective findings.  (AR 134-140).  The State Agency psychiatrist also substantiated his opinion by pointing to the psychiatric tests and objective medical findings in the record.  (AR 132).  Moreover, the medical expert's testimony was supported by the record and questioning of Plaintiff.  (AR 157-164).  Therefore, the ALJ had adequate medical evidence to make a disability determination and the ALJ's duty to further develop the record was not triggered.

### C.   The ALJ Properly Considered Lay Witness Testimony

Plaintiff contends that the ALJ did not properly consider the "testimony" of his wife, Jacqueline Knox.  Mrs. Knox did not testify at the hearing, but she submitted a Third Party Information Questionnaire dated May 18, 2003.  (AR 69-74).  Plaintiff points out that in the Questionnaire, Mrs. Knox alleged that Plaintiff could not remember everything he read in books or saw on TV, he did not like to leave the house and could socialize only "for a very short time," and he had trouble remembering appointments or how books or movies ended.  (AR 72-73).  Mrs. Knox also wrote that Plaintiff got "very angry when driving or when expected to do things he [didn't] want to do" and that he needed a "lot of rest and quiet."  (AR 73-74).  However, Mrs. Knox also indicated that Plaintiff had no difficulties with caring for himself; he cooked his own meals; he shopped without needing assistance; he did the laundry, took out the trash, and watered the plans without assistance; and enjoyed reading books, watching TV, and playing computer games.  (AR 69-71).

In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work.  <u>Stout v. Commissioner</u>, __F.3d __, 2006 WL 2052306, at *2 (9th Cir. July 25, 2006); <u>Smolen</u>, 80 F.3d at 1288; 20 C. F. R. §§ 404.1513(d)(4) & (e), and 416.913(d)(4) & (e).  The ALJ may discount the testimony of lay witnesses only if she gives "reasons that are germane to each witness." <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993).  <u>See also</u> <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." (citations omitted)).

In her opinion, the ALJ cited Mrs. Knox's questionnaire to support her decision to deny benefits.  The ALJ noted that the Questionnaire indicated that Plaintiff read books, watched television, played computer games, cooked, shopped, did household chores, and drove a car.  (AR 14) (citing Exhibit 5E).  Plaintiff concedes that the ALJ considered the lay testimony of his wife.  (Jt. Stip. at 9).  However, Plaintiff contends that the ALJ selectively discussed only the portions of Mrs. Knox's testimony that supported the ALJ's conclusion to deny benefits.  (Jt. Stip. at 10).

It is true that the ALJ did not explicitly discuss the statements that were favorable to Plaintiff.  However, an ALJ "need not discuss <u>all</u> evidence presented to her," but rather must explain why significant probative evidence has been rejected.  <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984)(emphasis in original).  Furthermore, a

22

close reading of Mrs. Knox's assessment of Plaintiff's limitations reveals that the ALJ did not reject the limitations Mrs. Knox assessed Plaintiff.  Cf. Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996) (lay witness testimony cannot be disregarded without comment).  The ALJ considered Plaintiff's memory problems, social anxiety, and anger issues in her disability evaluation.  According to Plaintiff's testimony and the medical expert's testimony, Plaintiff's social anxiety, attention and concentration problems, and anger and frustration issues were caused by stress.  For example, Plaintiff testified that he avoided socializing or shopping in grocery stores because they were "too stressful."  (AR 169-70).  The stress of long lines and not finding what he wanted would cause him to get "frustrated and probably angry."  (AR 170).  Plaintiff also stated that with medication, he was doing well, except that he still reacted "very poorly to stress."  (AR 158, 169).  When asked why he was not working, Plaintiff attributed stress as the cause.  He felt that if he took the medication and led a stress free life, he would be "okay."  (AR 169).

When Dr. Rath, the medical expert, testified, he stated that he also thought that many of Plaintiff's limitations, such as a slight to moderate impairment in his ability to recall simple or complex instructions, were "very much stress related . . . ."  Accordingly, Dr. Rath thought that Plaintiff's "main limitation is no more than a mild to moderate stress."  (AR 162).  Likewise, the medical expert thought that Plaintiff's ability to pay attention and concentrate varied according to how much stress Plaintiff was feeling.  (AR 163).  As a result of Plaintiff's hyper-reactiveness to stress, the medical expert concluded that Plaintiff could perform moderately complex tasks if he

were in a low stress situation, but only simple, repetitive tasks if he were under moderate to high stress. (AR 163). The ALJ adopted the medical expert's opinion in determining Plaintiff's RFC.

Mrs. Knox stated in the Daily Activities Questionnaire that Plaintiff had "trouble remembering appointments or how books or movies end[ed]," he forgot his chores, and he had to write down what he wanted to do every day. (AR 73). She also stated that Plaintiff did not like to leave the house or socialize for too long and that he would get very angry when he was driving. Furthermore, he needed a lot of rest and quiet. (AR 73-74). All of these limitations noted by Mrs. Knox were discussed by Plaintiff in his testimony and considered by the medical expert in rendering his opinion. The ALJ, therefore, considered all of the limitations noted by Mrs. Knox and incorporated them into her RFC determination.

To the extent that the ALJ erred by not providing specific reasons for rejecting some, if any, of Mrs. Knox's statements, the error was harmless. See Stout, 2006 WL 2052306, at *4-5 (harmless error where the mistake was nonprejudicial to the claimant, irrelevant to the ALJ's ultimate disability conclusion, or did not materially impact ALJ's decision). The ALJ in this case clearly considered Mrs. Knox's questionnaire and any error by the ALJ did not materially impact the ALJ's decision, as the ALJ incorporated Ms. Knox's limitations into the RFC determination.[3]

_____

[3] Furthermore, the Court notes that it is questionable whether Mrs. Knox's written statements can be considered lay witness "testimony." Because Mrs. Knox did not testify at the hearing, her allegations as stated in the Questionnaire were not subject to questioning by the ALJ

**D.   The ALJ Posed a Complete Hypothetical Question to the Vocational Expert**

Plaintiff contends that the ALJ failed to incorporate into the hypothetical any of the limitations set forth by Mrs. Knox, such as Plaintiff's memory and concentration problems, social anxiety, and anger problems.  (Jt. Stip. at 11).  In order for the vocational expert's testimony to constitute substantial evidence, the hypothetical question posed must "consider all of the claimant's limitations." Andrews, 53 F.3d at 1044.  However, the ALJ is not required to include limitations for which there was no evidence.  See Osenbrock v. Apfel, 240 F.3d 1157, 1164-65 (9th Cir. 2001) (ALJ not bound to accept as true the restrictions set forth in hypothetical if they were not supported by substantial evidence).

In Rollins v. Massanari, 261 F.3d 853 (9th Cir. 2001), Plaintiff argued that the ALJ erred in framing his hypothetical questions for the vocational expert because the questions did not include all of the limitations caused by her pain.  Id. at 857.  The Ninth Circuit concluded that the omitted limitations, however, were only those that the ALJ found did not exist.  Id.  Because the ALJ included all the limitations that he found to exist and because his findings were supported by substantial evidence, the ALJ did not err in omitting the limitations that Rollins had claimed, but had failed to prove.  Id.

_____

or Plaintiff's counsel.  Moreover, the Questionnaire was not signed under penalty of perjury and thus, does not bear the same indicia of reliability a declaration under oath provides.

The ALJ's hypothetical to Mr. Rinehart involved an individual of the same age, education (even specifying the same year of college degree) and work experience as Plaintiff, and limited to (1) no unprotected heights, (2) no hypervigilence or high production quota or rapid assembly line work, (3) brief, superficial contacts with co-workers, supervisors and the public, and (4) a low stress environment where he can do moderately complex tasks.  (AR 165-166).

As discussed above in the section regarding lay witness testimony, this hypothetical took into consideration all of Plaintiff's limitations supported by the record, including the limitations assessed by Mrs. Knox.  Because the ALJ included all of the limitations that he found to exist, and because his findings were supported by substantial evidence, the ALJ did not err.

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 18, 2006.

_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

26